# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Rodney Lail, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | **C.A. No. 10-CV-210-PLF** |
| v. ) | |
| ) | |
| United States Government, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | **EXHIBIT "A"** |

## AFFIDAVIT OF JAMES SPENCER

I, James Spencer, hereby declare under penalty of perjury the following based on my personal knowledge:

1. I am over the age of eighteen years and I am competent to testify

2. On June 6, 2000, I was intentionally, criminally and without basis entered into the FBI-NCIC system as a fleeing felon with an accompanying be on the lookout ("BOLO") advisory falsely characterizing me as "armed and extremely dangerous."

3. From June 6, 2000, to date I, *Pro Se* Plaintiff [James Spencer FKA Robert Holt], have been a victim of civil rights crimes, "under color of law" both with and without brutality, crimes that I have reported as complaints to personnel with the Federal Bureau of Investigation ("FBI") from February 21, 2001 to January 7, 2010

4. My mother, 93 year old Doris Holt, was also a victim of civil rights crimes, "under color of law" both with and without brutality, beginning from, June 7, 2000, crimes which have continued to the date of the filing of this motion.

5. Doris Holt reported these civil rights crimes, "under color of law" both with and without brutality beginning at the February 21, 2001, meeting in the lobby to FBI SA Marsh in Columbia, South Carolina and either by her or on her behalf up to and including January 7, 2010, to the FBI.

6. **Attachment "I" to this Exhibit "A",** contains evidentiary documents confirming events relevant to this Plaintiffs' Motion, Document No. 69.

7. On February 21, 2001, my mother, Plaintiff Doris Holt, and I traveled to the FBI offices in Columbia, SC for a scheduled meeting with FBI SA Thomas Marsh to file a complaint concerning our being victims of civil rights crimes, under color of law both with and without brutality.

8. When Doris Holt and I arrived, unexpectedly Defendant FBI SA Thomas Marsh refused to meet with my mother and said he [Marsh] would conduct her interview with her alone at some other point in time.

9. Doris Holt had no choice but to remain in the lobby of the FBI offices in Columbia, SC.

10. FBI SA Thomas Marsh never met with Doris Holt nor did any other FBI agent interview my mother as promised by FBI SA Thomas Marsh.

11. During the meeting on February 21, 2001, FBI SA Thomas Marsh reviewed the police videotapes that documented the illicit editing by the police.  Also unknown to FBI SA Marsh prior to his unprompted observation, as depicted in point 12 herein immediately below, the police videotape captured a citizen disguised as a police officer at the scene of the civil rights crimes, under color of law, with brutality  on August 6, 2000.

12. Defendant Marsh commented on the disguised individual when he spotted him and watched him for a couple of minutes when he first appeared on the police videotape. Marsh stated that, "this individual is clearly not a police officer and he [the disguised individual] should picked up and questioned for being involved in this."

13. On February 21, 2001, during the meeting referred to in points 7 – 12 herein, FBI SA Thomas Marsh ran an NCIC report to see if I [James Spencer FKA Robert Holt] was listed on the NCIC system.

14. On February 21, 2001, I provided FBI SA Thomas Marsh certified documentation that evidenced the fact there had been no outstanding warrants for me of any nature issued in Guilford County when I was (1) wrongfully inputted into the NCIC system on June 6, 2000, (2) on August 6, 2000 [when Officer Lail and me were stopped at gunpoint and when civil rights crimes under color of law with brutality occurred], and (3) on February 21, 2001, the date of the meeting with FBI SA Marsh.

15. On February 21, 2001, I provided a list of names addresses and telephone numbers of other victims and witnesses of/to civil rights crimes "under color of law" with and without brutality in these matters to Defendant, FBI SA Thomas Marsh.

16. The list of victims included, but was not limited to: Doris Holt, Irene Santacroce, minor child - Samantha Cooper, Nick Williamson, Rodney Lail, Ricky Stephens, Marguerite Stephens, Tammy Lail, minor child - Keith Lail, minor child – Brittany Lail, James Hammond, Southern Holdings and its shareholders (complete list provided), Dan Moore, John Santacroce and Dan Green.

17. Not one victim I listed and no witness I named was ever contacted by FBI SA Marsh in any manner, including Doris Holt, and I never heard again, directly or indirectly, from FBI SA Thomas Marsh or any other individual from the FBI as a result of the meeting and complaint I filed on February 21, 2001.

18. Based on sworn testimony given in my presence during the summer of 2004 by the perpetrators identified by me during my meeting with FBI SA Marsh on February 21, 2001, no perpetrator was ever interviewed or contacted in any manner by the FBI.

19. On October 24, 2001, I was informed by FBI SSA Gary Bray that FBI SA Thomas Marsh had retired and moved to Florida, and that Marsh had taken all his personal case notes with him he took at the meeting held on February 21, 2001.  **(See Attachment "I", Page 1.)**

20. I was also informed on October 24, 2001, by FBI SSA Gary Bray that there was a file kept on the complaint I filed on February 21, 2001, *"your file"* at the Columbia, FBI Office.

21. However, based on the FOIA responses I received all records of the meeting on February 21, 2001, disappeared from FBI records and all evidence I provided also disappeared from the FBI.

22. In repeated FOIA requests I was told by the FBIHQ there were no documents of the meeting of February 21, 2001 ever having occurred. **(See Attachment "I", Pg. 40, a letter from FBIHQ dated February 16, 2006.)**

23. Even the confirming NCIC inquiry made by Defendant FBI SA Thomas Marsh on February 21, 2001, was purged from the certified documentation of the NCIC system provided by FBIHQ to United States Senator Lindsey Graham's office. **(See Exhibit "H", Document No. 69-4, Pg. 119).**

24. M. McIntyre Sundin of the General Counsel's Office of the FBI refused to provide relevant NCIC information under Federal Subpoena, stating that the certified documents provided to United States Senator Graham were accurate and certified [for use in Federal Court].  **See Exhibit "H", Document No. 69-4, Pgs. 151 – 164.)**

25. Documents later obtained from the South Carolina Law Enforcement Division ("SLED") verified there was in fact a meeting on February 21, 2001, with FBI SA Thomas Marsh, at the FBI offices in Columbia, SC, irrespective of the missing records from the FBIHQ files and the wrongfully "doctored" certified CJIS report. **(See Attachment "I", Pgs. 52 – 55.)**

26. Additionally, the validating February 21, 2001, NCIC inquiry is documented in an earlier report obtained through United State Senator Strom Thurmond's Office prior to the commencement of any Court action, see point 23 herein. **(See Exhibit "H", Document 69-4, Pg. 82.)**

27. The documents obtained from SLED revealed the evidence provided to the FBI on February 21, 2001, was wrongfully immediately turned over to SLED on or about February 21, 2001, by the FBI and against FBI required policy the FBI wrongfully closed the case without out any required investigation being made. SLED took the evidence and on February 27, 2001, and closed the SLED case file without any investigation being done and stored away the evidence. **(See Attachment "I", Pgs. 52 - 55.)**

28. I was never informed of any such actions by the FBI documented in the SLED papers **(Attachment "I", Pgs. 52 - 55)** and instead was wrongfully misinformed by FBIHQ about the existence of an ongoing civil rights investigation numerous times.  I was even wrongfully misinformed by FBIHQ that there was an ongoing criminal investigation for possible prosecution in these matters on **February 28, 2006,** six months after the Statute of Limitations had run out on the reported civil

rights crimes that occurred during the summer of 2000, which is clearly not legally possible.  (**See Attachment "I", Page 41.**)

29. My mother, *Pro Se* Plaintiff Doris Holt, and I sent F.O.I.A. requests to FBIHQ in Washington, DC, on the same date October 27, 2005 written with the same wording.  However, the responses were inconsistent. Doris Holt's FOIA response indicated there was an ongoing investigation and the response to my FOIA request said there were no records on file. Since we both filed also filed civil rights complaints under color of law at the same time in the same manner, with the same background, the responses being both simultaneously accurate is legitimately implausible if not problematic. (**See Attachment "I", Pgs. 18 - 23.**)

30. On **June 18, 2004,** I met in Washington, DC, with James Galyon, Majority Counsel for the Senate Committee on the Judiciary.

31. During the meeting on **June 18, 2004**, James Galyon unexpectedly contacted the FBI Headquarters in Washington, DC, in an apparently prearranged call with an individual with Justice Department's Civil Rights Division.  Mr. Galyon used the speakerphone so we could all participate in the discussion [Marguerite Stephens, Ricky Stephens, Tammy Lail, Nicholas Williamson, PhD, Rodney Lail and myself]. Mr. Galyon reported the civil rights complaints (including Doris Holt's

complaint) under color of law with brutality and without brutality, complaints that were never investigated by the FBI.

32. Mr. Galyon, soon after the meeting on **June 18, 2004**, notified the meeting attendees that an investigator was being assigned to the geographical area to investigate the civil rights crimes under color of law and other associated public corruption we reported.  We were notified that the name of the investigator was FBI SA Paul Gardner.

33. On **June 18, 2004**, the group of individual victims and I also met in Washington DC, with House Judiciary Committee member Howard Coble, his Chief of Staff and an FBI SA liaison with the House Judiciary Committee and we expressed the same concerns as we did with James Galyon earlier in the day.

34. I mentioned that we had spoken to James Galyon earlier in the day about the same concerns and that Mr. Galyon had contacted the Justice Departments Civil Rights Division, in Washington, DC.

35. The FBI SA agent present at the Congressman Coble meeting wrote down our names and contact information including Doris Holt's name and our civil rights complaints.  The agent said he would personally follow up with the individuals at the Justice Department previously

contacted by Senator Graham's Office to make sure that our complaints was handled properly.

36. On **July 13, 2004**, my mother, Doris Holt, and I met with FBI SA Andrew Hildreth and filed a civil rights complaint under color of law with and without brutality at a meeting with Assistant United States Attorney Marshal Prince from the local US Attorney's Office in Columbia, SC and the US Attorney's Office in Columbia, SC. (**See Attachment "I", Pg. 3.**)

37. During **October, 2004**, my mother, Doris Holt, and I along with Plaintiffs Bruce Benson, Nick Williamson and Rodney Lail, met with FBI SA Paul Gardner and filed a civil rights complaint under color of law with and without brutality at a meeting at my mothers and my apartment in Columbia, SC.

38. During the **October, 2004,** meeting, FBI SA Paul Gardner refused to take a copy of evidentiary documents belatedly produced under Federal Court Order.  The documents included part of a handwritten journal by a self confessed and convicted felon Herold Hartness, a journal which documented bribes of $1,500 each for three local law enforcement officers involved in the civil rights crimes we reported along with felon Herold Hartness.

39. During that same **October, 2004** meeting FBI SA Paul Gardner told us [Rodney Lail, Nick Williamson, Bruce Benson, Doris Holt and myself] the reason he did not want to take the documentation on the bribes because he was operating alone and was reporting directly to Washington FBIHQ as part of an undercover task force on this case and he did not want to take evidence until he knew whom he could trust in the local FBI office.

40. During **November 2004**, I met a second time with FBI SA Gardner and Rodney Lail at the Columbia, SC office of the FBI to discuss various aspects of our civil rights complaints.

41. During **December 2004**, I had a third meeting with SA Gardner and Lail in Florence, SC, during which I showed Defendant SA Gardner an evidence-based video documentary on public corruption and civil rights violations under color of law with and without brutality in this case.

42. On or about **December 13, 2004**, my timeline of events of civil rights crimes under color of law that FBI SA Gardner requested each of the victims to construct including Doris Holt was filed with SA Paul Gardner. Defendant Paul Gardner personally confirmed he received both our timelines over the telephone to me on **December 13, 2004**.

43. On or about early **January 2005**, FBI SA Gardner met with me in Columbia, SC, to secure copies of the DVD video evidence-based documentary of the case Gardner had been asking for since he saw the documentary in Florence during the meeting with Mr. Lail and myself which occurred in December, 2004.

44. I asked FBI SA Gardner *at each and every meeting* I had with him for a business card. At each meeting FBI SA Gardner told me and others who asked that he did not have any business cards with him. (**See herein ¶¶ 37, 40, 41 & 43.**)

45. During the same meeting which I provided SA Gardner the evidence-based documentary, Defendant Gardner gave me a document that Gardner characterized as the only document in the FBI file in Columbia SC and in FBIHQ in Washington DC, regarding the February 21, 2001, meeting I had with FBI SA Thomas Marsh. (**See Attachment "I", Pg. 8.**)

46. The document referenced in paragraph number 44 herein immediately above identified that I tried to file a civil rights complaint on February 21, 2001, but according to the document Gardner provided dated October 1, 2001, my civil rights complaint was not captioned as such by the FBI. The document Gardner provided was a complete distortion of events. This is verified as such a distortion by the SLED documents concerning

the February 21, 2001 meeting with FBI SA Thomas Marsh.  **(See Attachment "I", Pg. 52 - 55.)**

47. On **July 22, 2005**, I received a telephone call from FBI SA Phil Gardner.

48. During the telephone call on **July 22, 2005**, SA Gardner informed me that a special standing committee had decided not to investigate the civil rights violations despite his recommendation to do so.  SA Gardner further informed me that the Statute of Limitations was due to run out on August 6, 2005 and the FBI had already reached their quota of civil rights cases for that year which is why the standing committee at FBIHQ had turned down his [FBI SA Paul Gardner's] alleged request to investigate. **(See Attachment "I", Pgs. 26, 27, 31, 42, 45, 46, 48, 49, 50 & 51.)**

49. I never heard from FBI SA Paul Gardner again and not one of the evidentiary materials Doris Holt and I provided FBI SA Paul Gardner were returned despite Doris Holt and my repeated requests.

50. I filed FOIA'a and another civil rights complaint under color of a law, with brutality after my mother was kidnapped by the SC State Authorities but never received any action requesting procedural manuals or help in the civil rights violations regarding the abuse in the disappearance of my mother. **(As examples See Attachment "I" Pgs. 69, 70 & 71.)**

51. According to FBI records there never was a proper investigation as required, of Doris Holt's and my civil rights complaints, an investigation which is required according to the non-discretionary FBI Manual of Investigative Operations "MIOG".  **(As an example see Exhibit H, Section 44, Pdf. Pg. 192.)**

**Affiant Sayeth Further Naught.**


**I DO SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE ABOVE FORGOING STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY PERSONAL KNOWLEDGE.**

<u>**November 11, 2010**</u>
Date

*James Spencer* (signature)